UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN BIOCARE, INC., *et al.,*

                    Plaintiffs,          No. 14-cv-14464

vs.                               Hon. Gerald E. Rosen

HOWARD & HOWARD ATTORNEYS, PLLC;
JIRA LLC; JIRA III, LLC; REDEMPTION
HEALTH CARE, LLC; and
SHCC SERVICES TX, LLC,

                    Defendants.

_____/

OPINION AND ORDER GRANTING
<u>DEFENDANTS' MOTIONS TO DISMISS</u>

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on September 30, 2016

PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge

I.  <u>INTRODUCTION</u>

Plaintiffs American Biocare, Inc. ("ABI") and various ABI "subsidiaries" have

brought this suit alleging that Howard & Howard Attorneys PLLC ("Howard &

Howard"), four of the firm's current or former clients -- JIRA, LLC ("JIRA"), JIRA III,

LLC ("JIRA III"), Redemption Health Care, LLC ("Redemption") and SHHC Services

TX, LLC ("SHHC") (collectively the "JIRA Defendants") -- and various non-party

individuals and entities engaged in racketeering activity, and converted property that ABI

1

claims it owned.  Plaintiffs' 76-page, 275-paragraph First Amended Complaint contains three substantive counts:  a claim against all of the defendants for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.,* ("RICO") (Count I); a claim under state law for conversion against the JIRA Defendants (Count IV), and a claim against Howard & Howard for aiding and abetting that conversion (Count V).[1]

Howard & Howard and the JIRA Defendants now move, in separately-filed motions, to dismiss all of Plaintiffs' claims against them.  Both Howard & Howard and the JIRA Defendants seek dismissal pursuant to Fed. R. Civ. P. 12(b)(6).  The JIRA Defendants also seek dismissal pursuant to Fed. R. Civ. P. 12(b)(1).  Responses, Reply Briefs, and Supplemental Briefs have been filed.

Having reviewed and considered the parties' briefs, supporting documents, and the entire record of this matter, the Court has determined that oral argument is not necessary.  Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), this matter will be decided on the briefs.  This Opinion and Order sets forth the Court's ruling.

---

[1]  Counts II and III are pled in the alternative, but neither Count sets forth a substantive claim.  In Count II, Plaintiffs seek a declaratory judgment that they own the property they claim was converted by virtue of a non-party secured creditor's asset foreclosure sale to some of the defendants, and in, the alternative, in Count III Plaintiffs seek a constructive trust regarding that property.  Plaintiffs have withdrawn their constructive trust claim, therefore, Count III will be dismissed.  Plaintiffs' claims in Count II will be addressed in conjunction with their claim for conversion in Count IV.

<u>FACTUAL BACKGROUND</u>

Plaintiff American Biocare, Inc. ("ABI") has been embroiled in litigation with Howard & Howard and clients of the law firm since early 2013. ABI is a holding company allegedly formed to raise capital for the acquisition of home health care agencies. In 2011, various entities owned by ABI or in which ABI had some interest (the "ABI Entities")[2] purchased several home health care agencies in Michigan, Tennessee and Texas. To finance the purchase, the ABI Entities borrowed $3.9 million from Citizens Bank (the "Loan") and another $4.3 million in private financing from Peachtree Equity Partners. ABI itself was not a borrower but it guaranteed repayment of the Loan. To secure the guaranty, ABI and the ABI Entities pledged the Entities' assets, membership interests and shares in the ABI Entities (the "Pledged Assets") as collateral.[3]

Less than a year after the Loan closing, the Loan was in default and ABI and the

---

[2] The entities were JIRA Holdings, LLC ("JIRA Holdings"), KJJ Holdings, LLC ("KJJ Holdings"), Health Care Partners, Inc. ("HCP"), Southwest Home Health Care Holdings, LLC ("SWHHC Holdings"), SWHHC Management-Central Texas, LLC("SWHHC Management"), Southwest Home Health Care of Harris, LLC ("SWHHC-Harris"), Southwest Home Health Care-Central Texas ("SWHHC-Central Texas"); Southwest Home Heath Care of East Texas, LLC ("SWHHC-East Texas"), Southwest Home Health Care of Dallas, LLC ("SWHHC-Dallas"), Care Choices of Tennessee, Inc. and CC Tennessee Holdings, LLC. All but the last two of these entities -- Care Choices of Tennessee, Inc. and CC Tennessee Holdings, LLC -- are named as party-plaintiffs (the "New Plaintiffs") in this action. The New Plaintiffs were added to this action when ABI filed the First Amended Complaint

[3] The Pledged Assets included membership interests in the ABI Entities along with "all existing accounts, accounts receivable, health-care insurance receivables, deposit accounts, inventory, equipment and general intangibles" of some of the entities.

ABI Entities defaulted on their guaranty.  FirstMerit Bank ("FirstMerit"), as successor to

Citizens Bank, foreclosed on the Pledged Assets and sold them at a UCC private

foreclosure sale to Defendants JIRA, JIRA III, and SHHC as follows:

- To JIRA III:  ABI's membership interests in SWHHC Holdings and JIRA Holdings (including JIRA Holdings' membership interest in KJJ Holdings (which includes KJJ Holdings' capital stock in HCP)) and SWHHC-Harris's membership interest in SWHHC-East Texas;

- To SHHC:  all existing accounts, accounts receivable, health-care insurance receivables, deposit accounts, inventory, equipment and general intangibles of SWHCC Management, SWHHC-Central Texas, SWHHC-Harris, SWHHC-East Texas, and SWHHC-Dallas; and

- To JIRA:  all existing accounts, accounts receivable, health-care insurance receivables, deposit accounts, inventory, equipment and general intangibles of JIRA Holdings, KJJ Holdings and HCP.

[*See* JIRA Defendants' Ex. D; Howard & Howard Ex. H]

Shortly after JIRA, JIRA III and SHHC purchased the assets and membership

interests in the New Plaintiffs, they were assigned to Redemption Health Care, LLC

("Redemption"), another party-defendant in this action.  *Id.*

ABI'S LITIGATION HISTORY

Meanwhile, on April 29, 2013, *i.e.*, between the time of ABI's default on the Loan

guaranty and FirstMerit's November 2013 asset foreclosure sale, ABI filed a lawsuit in

Oakland County Circuit Court against Kevin Ruark, Jamin Ruark, Jason Laing (the

4

"Ruark Individuals"), certain companies owned by them, and other individuals.[4]  *See*

*American Biocare, Inc. v. Kevin Ruark, et al.,* Oakland County Circuit Court No. 2013-

133540-CK.  The case was assigned to Judge Colleen O'Brien.[5]   In Judge O'Brien's

case, ABI alleged that Kevin Ruark made misrepresentations to ABI that caused ABI to

purchase certain other home health care companies -- including JIRA and several other

entities named as parties in this action, some of which were companies in which Kevin

Ruark had an interest -- and that after the acquisition, the Ruark Individuals violated non-

competition agreements with ABI.[6]  Howard & Howard represented the defendants in the

O'Brien case.

Simultaneously with the filing of their complaint in the O'Brien case, ABI sought

injunctive relief by bringing a motion for a temporary restraining order to prohibit the

Ruark Individuals from engaging in further competition with ABI and its affiliated

companies.

---

[4]  The Ruark Individuals also have membership interests in some or all of the
JIRA Defendants.  However, none of the JIRA Defendants were named as parties in this
Oakland County action.

[5]  The Court takes notice that during the pendency of the instant motions, this
Oakland County action was reassigned to Judge Cheryl A. Matthews.  *See*
https://courtexplorer.g2gcloud.com/oaklandcounty.  However, the Court will continue to
refer to it as the "O'Brien case" as this is how the parties refer to the case in their briefs.

[6]  Plaintiffs make these same allegations in this case.  *See* First Amended
Complaint, ¶¶ 58-77.  The non-compete agreement at issue in Judge O'Brien's case
allegedly arose out of agreements entered into as part of ABI's acquisition deal.  *See id.,*
¶¶ 66-68.

On July 11, 2013, in order to resolve ABI's motion for a TRO, the parties in the O'Brien case stipulated to the entry of a limited Status Quo Order which provided, in relevant part:

> IT IS HEREBY ORDERED that until further order of this Court, defendants Kevin Ruark, Jamin Ruark and Jason Laing will not take employment, or have any ownership, in a company that operates or manages a home health care agency in the States of Michigan, Tennessee and Texas, excluding San Antonio, Texas (i.e., using the area specifically stated in Section 9.1 of th Texas Purchase Agreement), and excluding John Paul Home Care, Inc.
>
> * * *
>
> IT IS HEREBY FURTHER ORDERED that nothing in this Order shall be construed as an admission of liability or a waiver of any rights or remedies of any Party.  It is agreed and acknowledged that this Order and its provisions may not be used for purposes of seeking or opposing injunctive or other relief (other than a violation of this Order).

[*See* Howard & Howard Ex. E.]

Thereafter, on November 6, 2013, Judge O'Brien granted Howard & Howard's clients' motion for partial summary disposition, dismissing four counts of the complaint -- including ABI's claim for fraud/misrepresentation -- in their entirety.

Subsequently, on January 17, 2014, ABI filed a motion in the case asking the Court to hold Howard & Howard and its clients in contempt of court.  ABI argued that JIRA, JIRA III and SHHC's purchase of the Pledged Assets from FirstMerit following ABI's default on the acquisition Loan constituted a violation of the Status Quo Order entered in July 2013 because the Ruark Individuals owned or controlled one or more of the entities that purchased the Pledged Assets, and these entities were engaged in the

6

home health care business in Michigan.

Judge O'Brien apparently agreed with ABI because on February 19, 2014, she entered an order finding Kevin Ruark, Jamin Ruark and Jason Laing to be in civil contempt for violating the Status Quo Order, reserving the issue of damages for violation of the Order for trial.  (Howard & Howard was *not* held in contempt.)  No trial, however, was ever held because on March 28, 2014, Kevin Ruark filed for Chapter 7 bankruptcy, and on April 7, 2014, ABI and the other parties stipulated to administratively close the case in its entirety, without prejudice, due to the bankruptcy.  The case remains closed to this date.

<u>The Second Oakland County Lawsuit</u>

Not long after stipulating to administratively close the O'Brien case, on July 22, 2014, ABI filed a new lawsuit in Oakland County Circuit Court, this time naming as defendants Howard & Howard, JIRA, JIRA III, and Redemption, *i.e.*, the same entities named as defendants in this case.  *See American Biocare, Inc. v. Howard & Howard Attorneys PLLC, et al.,*Oakland County Circuit Court No. 2014-141991-CZ.  The case was initially assigned to Judge Michael Warren but then was re-assigned to Judge James Alexander.  The Complaint in Judge Alexander's case alleged that the defendants (excluding Howard & Howard) were liable for conversion by purchasing the Pledged

Assets from FirstMerit, and that Howard & Howard aided and abetted this conversion.[7] However, shortly after filing the second Oakland County lawsuit, ABI voluntarily dismissed the case on September 5, 2014.

Plaintiffs Filed this Action

Two months later, on November 21, 2014, ABI filed its Complaint in this matter, making substantially the same allegations against the same parties and alleging the same conversion claims it made in the second Oakland County lawsuit, but adding SHHC as a party-defendant, and adding a RICO violation claim.[8]

Defendants now move to dismiss this action in its entirety.

## III. DISCUSSION

### A. APPLICABLE STANDARDS

Fed. R. Civ. P. 12(b)(1) is the applicable procedural rule for challenging lack of subject matter jurisdiction. "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996).

Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598

---

[7] These are the same claims alleged by Plaintiffs in Counts IV and V of the First Amended Complaint in this case.

[8] It is only the newly-added RICO claim that provides the basis for federal subject matter jurisdiction.

(6th Cir. 1994).  A facial attack on subject matter jurisdiction goes to whether the plaintiff has properly alleged a basis for subject matter jurisdiction, and in such a case, the trial court takes the allegations of the complaint as true.  *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).  A factual attack is a challenge to the factual existence of subject matter jurisdiction.  Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (citation omitted). In such a motion, "no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  *Id.*  Thus, in ruling on Rule 12(b)(1) motions challenging the factual basis for subject matter jurisdiction, the court may look to evidence outside the pleadings.  *Nichols v. Muskingum College*, 318 F.3d 674, 677 (6th Cir. 2003).

Fed. R. Civ. P. 12(b)(6) authorizes the Court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted. . . ."  In deciding a motion brought under Rule 12(b)(6), the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pled factual allegations as true.  *League of United Latin American Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir. 2007).  Yet, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to

legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).

Moreover, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation

of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550

U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007) (internal quotation marks, alteration, and

citations omitted).  Rather, to withstand a motion to dismiss, the complaint's factual

allegations, accepted as true, "must be enough to raise a right to relief above the

speculative level," and "state a claim to relief that is plausible on its face." *Twombly,* 550

U.S. at 555, 570, 127 S. Ct. at 1965, 1974.  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S. Ct. at

1949.  The plausibility standard, however, "asks for more than a sheer possibility that a

defendant has acted unlawfully." *Id.*  "Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between possibility and

plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct.

1955).

        In applying this 12(b)(6) standard, matters outside the pleadings cannot be

10

considered.[9]  However, documents attached to a Rule 12(b)(6) motion to dismiss that are referred to in the Complaint and central to the claim are deemed to form part of the pleadings, and as such, may properly be considered.  *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999); *Armengau v. Cline*, 7 Fed. App'x 336, 344 (6th Cir. 2001).  Further, "[a] court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007).

The Court will apply the foregoing standards in deciding Defendants' Rule 12(b)(1) and 12(b)(6) motions in this case.

**B.     THE NEW PLAINTIFFS HAVE NOT AUTHORIZED THIS LAWSUIT AND ABI LACKS STANDING TO BRING SUIT ON THEIR BEHALF**

The Court must first address the issue of subject matter jurisdiction as raised by the JIRA Defendants in their Rule 12(b)(1) motion.  "Subject matter jurisdiction is always a threshold determination." *American Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir.2007) ( citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L. Ed. 2d 210 (1998)).  Defendants contend that the Court lacks jurisdiction over this matter because Plaintiffs lack standing to bring this suit.

---

[9] If on a Rule 12(b)(6) motion matters outside the pleadings are presented to the court, the motion must be treated as a motion for summary judgment under Rule 56.  *See* Fed. R. Civ. P. 12(d).

A motion to dismiss on the grounds that the plaintiff lacks standing is properly

considered as a motion for lack of subject matter jurisdiction.  *Murray v. United States*

*Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012).  Standing is "a jurisdictional

matter, and a plaintiff's lack of standing is said to deprive a court of jurisdiction." *Ward*

*v. Alternative Health Delivery Sys.*, 261 F.3d 624, 626 (6th Cir. 2001); *see also*

*Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1419 (6th Cir.

1996) (the requirement of standing is jurisdictional and the burden to establish it persists

at every phase of the litigation).

As the Sixth Circuit explained in *Murray*:

> Article III of the Constitution gives federal courts subject matter
> jurisdiction over actual cases or controversies, neither of which exists
> unless a plaintiff establishes his standing to sue.  *ASARCO Inc. v. Kadish*,
> 490 U.S. 605, 613, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989); *Allen v.*
> *Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *see*
> U.S. Const. art. III § 2.  Because federal courts "sit 'solely ... to decide on
> the rights of individuals,'" *Hein v. Freedom from Religion Found., Inc.*,
> 551 U.S. 587, 598, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007) (quoting
> *Marbury v. Madison*, 1 Cranch 137, 170, 2 L.Ed. 60 (1803)), standing is
> "the threshold question in every federal case.  *Coyne v. Am. Tobacco Co.*,
> 183 F.3d 488, 494 (6th Cir.1999) (quoting *Warth v. Seldin*, 422 U.S. 490,
> 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

*Murray*, 681 F.3d at 748.

"'The irreducible constitutional minimum of standing contains three elements.'"

*King v. IB Property Holdings Acquisition*, 635 F. Supp. 2d 651, 657 (E.D. Mich. 2009)

(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d

351 (1992). First, a plaintiff must show that he has suffered an "injury in fact." *Id*. He

12

must have suffered "a harm that is both 'concrete' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), quoting, *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). Second, a plaintiff must establish a causal connection between the alleged injury and the conduct of which he complains. *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. That is, the injury must be "fairly traceable" to the defendant's actions. *Id*. Third, a plaintiff must demonstrate that the injury is redressable in the action. *Vermont Agency*, 529 U.S. at 771, 120 S.Ct. 1858.

Further, standing is to be gauged by the specific claims that a party presents, *i.e.,* "whether the *particular plaintiff* is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752, 104 S.Ct. 3315, 3325 (1984) (abrogated on other grounds, *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. ___, 134 S.Ct. 1377 (2014)) (emphasis added). In other words, the claim must relate to the particular plaintiff's own legal rights and interests, rather than the legal rights or interests of third parties. *Elk Grove Unified School Dist. v. Newdow*, 540 U.S. 1, 14, 124 S.Ct. 2301, 2310 (2004). The burden is on the party who seeks the exercise of jurisdiction in its favor "clearly to allege facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute." *United States v. Hays*, 515 U.S. 737, 743, 115 S.Ct. 2431, 2435 (1995).

In this case, ABI, through counsel, filed an Amended Complaint which added nine New Plaintiffs -- JIRA Holdings, LLC, KJJ Holdings, LLC, Health Care Partners, Inc., Southwest Home Health Care Holdings, LLC, SWHHC Management Central Texas, LLC, Southwest Home Health Care-Central Texas, LP, Southwest Home Health Care of Harris, LLC, Southwest Home Health Care of East Texas, LLC, and Southwest Home Health Care of Dallas, LLC.[10]   However, ABI did not, at the time of filing, nor does it now, own or control these New Plaintiffs.

It is axiomatic that a corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to subsidiaries of the subsidiary. *Dole Foods, Inc. v. Patrickson*, 538 U.S. 468, 475 (2003) (citing 1W. Fletcher, Cyclopedia of the Law of Private Corporations, § 31 at 514  (1999)) ("The properties of two corporations are distinct, though the same shareholders own or control both. A holding corporation does not own the subsidiary's property.")

More importantly, ABI admits that FirstMerit Bank foreclosed on its ownership interests in, and the assets of, all of the New Plaintiffs, *see* First Amended Compl., ¶¶ 53, 133; Defendants' Ex. D, H, and sold them to Defendants JIRA, JIRA III and SHHC *Id.,* Compl., at ¶¶134-136; Defendants' Ex. D, H.  Further, the New Plaintiffs' present

---

[10]  All of these New Plaintiffs are represented in this action by the same counsel as ABI.

owners did not authorize the filing of the Amended Complaint, and, in fact, have demanded the dismissal of all claims in this action brought on behalf of JIRA Holdings, KJJ Holdings, HCP, SWHHC-Harris, SWHHC-East Texas, SWHHC Management, SWHHC-Central Texas, SWHHC-Dallas, and SW Holdings. *See* Affidavit of Jason Laing, JIRA Defendants' Ex. E, ¶¶ 7-8; 14-15.

Plaintiffs argue that the Court should decide the standing issue here under Rule 12(b)(6) standards and, as such, the Court should disregard Jason Laing's affidavit attesting to ABI's lack of ownership rights in the New Plaintiffs and ABI's lack of authority to assert any claims on their behalf. As support for this proposition, Plaintiffs cite *Block v. BAC Home Loans Servicing LP*, 2012 WL 2031640 (E.D. Mich. June 6, 2012). Plaintiffs' reliance on *Block* is misplaced.

*Block* was a quiet title action brought to set aside a real estate mortgage foreclosure on the plaintiffs' principal residence which involved the Michigan foreclosure-by-advertisement statute. The defendants in that case moved for dismissal of the action under Rule 12(b)(1), arguing that the plaintiffs lacked standing to assert their claim to quiet title to the foreclosed property after the statutory 6-month redemption period had expired. The court stated that "the term 'standing' is 'a bit of a misnomer' in the context of this sort of mortgage-related claim. . . . [A] plaintiff's failure to assert a claim during the redemption period is an issue that goes to the claim's merits." 2012 WL 2031640 at *2. Therefore, the *Block* court determined that the motion to dismiss in that

15

case should be decided under the standards governing Rule 12(b)(6) motions.[11]

This case does not involve a Michigan real estate property foreclosure-by-advertisement, nor does it involve an analogous post-foreclosure sale statutory period of redemption.[12]

Here, Article III standing principles are squarely at issue. The New Plaintiffs are no longer owned by ABI; ABI's interests in the New Plaintiffs were foreclosed upon by FirstMerit Bank, a non-party to this action, and the new owners of the "New Plaintiffs" have not authorized that this suit be brought on behalf of their behalf.

ABI argues that the new owners, JIRA, JIRA III and SHCC, were not good faith transferees such that they acquired the New Plaintiffs from FirstMerit free of the rights and interests of ABI and its borrowing subsidiary entities as provided in M.C.L. § 440.9617(2). However, as explained in the Uniform Commercial Code Comments, generally it is when a transferee has knowledge of defects *in the sale* or buys in collusion with *the secured party* that he may be deemed to not be acting in good faith. M.C.L. § 440.8617, U.C.C. Comment 3. There is nothing of record showing any defect in FirstMerit's sale and there is no allegation that FirstMerit colluded with JIRA, JIRA III

---

[11] Applying the Rule 12(b)(6) standards, the court ultimately granted the defendant's motion to dismiss. *See Block*, 2012 WL 2031640 at *6.

[12] Indeed, in marked contrast to real property foreclosures, in the UCC asset foreclosure context, there is no post-disposition-of-property right of redemption in Michigan. A debtor, any secondary obligor, or any other secured party or lienholder may only redeem collateral *before* the secured creditor has disposed of the collateral or entered into a contract for its disposition. *See* M.C.L. § 440.9623(3).

16

or SHCC.

Plaintiffs argue that because Jason Laing, a non-party in this case, was one of individuals subject to the Status Quo Order entered in Judge O'Brien's Oakland County four months before the foreclosure sale, and because Laing is a member of JIRA III, LLC, one of the foreclosure asset purchasers and a member of Redemption Health Care Holdings, LLC, which is the sole member of Redemption Health Care, LLC, the post-foreclosure sale assignee of all of the JIRA Defendants purchased assets, [*see* Laing 2/27/15 Affidavit], the JIRA Defendants had to have known that they could not purchase the foreclosed assets. While the purchase of the assets ultimately did subject Laing to being found in contempt of court, it still does not confer Article III standing on ABI to bring this suit on behalf of the New Plaintiffs who did not and do not consent to pursuing this litigation. Hence, there is no actual case or controversy with regard to the New Plaintiffs over which the Court has subject matter jurisdiction. The JIRA Defendants' 12(b)(1) motion to dismiss, therefore, will be GRANTED, and the New Plaintiffs -- JIRA Holdings, KJJ Holdings, Health Care Partners, SWHHC Holdings, SWHHC Management, SWHHC-Central Texas, SWHHC-Harris, SWHHC-East Texas, and SWHHC-Dallas -- are DISMISSED from this action.

C.     ABI HAS NOT STATED A CLAIM FOR WHICH RELIEF CAN BE
       GRANTED FOR ANY VIOLATION OF RICO

The civil remedy provisions of RICO state that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue

therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. . . ." 18 U.S.C. § 1964(c).

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in" activities affecting "interstate or foreign commerce. . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Thus, to allege a RICO claim, a plaintiff "must show '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495-96, 105 S.Ct, 3275 (1985)).  "A plaintiff must allege each element . . . to properly state a claim" for RICO.  *Id.*  In addition, a plaintiff must show injury to his business or property. *Jackson v. Sedgwick Claims Mgmt Serv's, Inc.*, 731 F.3d 556, 562 (6th Cir. 2013) (en banc).  Section 1962(d) adds as an additional element "the existence of an illicit agreement to violate one of RICO's criminal provisions.  *Heinrich*, 668 F.3d at 411 (quoting *United States v. Sinto*, 723 F,2d 1250, 1260 (6th Cir. 1983).

To prevail under Section 1962(c), a plaintiff "must set forth allegations to establish that the defendant conducted or participated, 'directly or indirectly, in the conduct of [the RICO] enterprise's affairs."  *Ouwinga v. Benistar 519 Plan Serv's*, 694 F.3d 783, 791-92 (6th Cir. 2012) (citing (18 U.S.C. § 1962(c) (brackets in original)).

Participation in the conduct of an enterprise's affairs requires proof that the defendant participated in the "operation or management" of the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S.Ct. 1163 (1993). Defendants must have "conducted or participated in the conduct of the 'enterprise's affairs,' not just their *own* affairs." *Id.* at. 185 (emphasis in original).

> In order to establish the existence of an 'enterprise' under Section 1962(c) a plaintiff is required to prove: (1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged.

*United States v. Chance*, 306 F.3d 356, 372 (6th Cir. 2002 (citing *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993).

A "pattern of racketeering activity" requires, at a minimum, two acts of racketeering activity, 18 U.S.C. § 1961(5). Though two predicate acts are necessary they "are not necessarily sufficient[;] a plaintiff must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Ouwinga* 694 F.3d at 795 (quoting *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237-39, 109 S.Ct. 2893 (1989); *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 354 (6th Cir. 2008) (although necessary to sustain a RICO claim, the pleading of two predicate acts may not be sufficient because § 1961(5) "assumes that there is something to a RICO patter beyond the number of predicate acts involved.") "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the

continuity] requirement." *H.J. Inc.,* 492 U.S. at 242.

"Predicate acts" which comprise "racketeering activity "are defined in 18 U.S.C. § 1961(1)(B) as including any act 'indictable' under certain enumerated criminal statutes, including 18 U.S.C. § 1341, which makes mail fraud a criminal offense, and 18 U.S.C. § 1343, which makes wire fraud a crime." *Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1399 (9th Cir. 1986).

Here, ABI makes passing reference to four purported predicate acts: violation of the Michigan conversion statute, M.C.L. § 600.2919a; mail fraud, 18 U.S.C. § 1341; wire fraud, 18 U.S.C. § 1343; and bank fraud, 18 U.S.C. § 1344. The Michigan conversion statute is a tort statute, not a criminal statute, and a violation of that statute does not constitute a predicate act that may support a RICO claim, *see* 18 U.S.C. § 1961.[13] And, only a defrauded financial institution may assert bank fraud as a predicate act for a federal RICO claim. *See W&S Life Ins. Co. v. JP Morgan Chase Bank, N.A.*, 2014 WL 5308422 at * 22 (S.D. Ohio Oct. 16, 2014); *Tunne v. Hendrick*, 2012 WL 3644825 at * 13 (W.D. Ky. Aug, 24, 2012); *Infocision Mgmt. Corp. v. Foundation for Moral Law, Inc.*, 2009 WL 650282 at * 9 (N.D. Ohio Jan. 14, 2009); *Herrick v. Liberty League Int'l*, 2008 WL 2230702 at * 4 (S.D. Ohio May 28, 2008).

---

[13] With respect to violations of state statutes, only acts or threats involving "murder, kidnapping, arson robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance" . . . which are "chargeable under State law and punishable by imprisonment for more than one year" may constitute predicate acts for purposes of RICO. 18 U.S.C. § 1961(1).

> To allege a violation of the mail fraud statute
>
> it is necessary to show that (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud.

*Central Distributors of Beer, Inc. v. Conn*, 5 F.3d 181, 183-84 (6th Cir. 1993) (some internal punctuation omitted).  Courts have interpreted the wire fraud statute as having essentially the same elements as the mail fraud statute except for the use of the wires instead of the mails.  *United States v. Bibby*, 752 F.2d 1116, 1126 (6th Cir. 1985); *see also United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994).

<u>JIRA Defendants</u>

Despite bringing its RICO claim in this action against all *Defendants*, ABI makes no allegations concerning the activities of any of the JIRA Defendants.  The sum total of Plaintiff's allegations in support its RICO claim concern alleged actions of Howard & Howard and various non-parties.  The fact that some of  the non-party individuals alleged to have participated in the "Ruark Enterprise" were affiliated with some of the JIRA Defendants is not enough to make out a fraud-based RICO claim against these defendant-entities.

Fed. R. Civ. P. 9(b) requires that a plaintiff alleging fraud plead such fraud with particularity as to the circumstances constituting the fraud.  *See* Fed. R. Civ. P. 9(b).  "Courts rigorously enforce Fed. R. Civ. P. 9(b)'s pleading requirements in RICO cases in which the predicate acts are mail fraud and wire fraud, and have further required specific

allegations as to which defendant caused what to be mailed (or made which telephone

calls), and when and how each mailing (or telephone call) furthered the fraudulent

scheme." *Thomas v. Daneshgari*, 997 F. Supp. 2d 754, 763 (E.D. Mich. 2014) (citations

omitted).  Plaintiff here alleges no particular facts that would constitute a legitimate

RICO predicate act of mail or wire fraud, does not state which JIRA Defendant did what

act(s) or when, nor has ABI stated any injury to its business as a result of any act or

omission by the JIRA Defendants.  Though Plaintiff does state that it was injured to the

extent that it lost its membership interests in and lost receivables of the New Plaintiffs, as

explained above, ABI's interest in those entities became the property of FirstMerit by

virtue of ABI's default on the loan guaranty and FirstMerit's foreclosure -- *not* because

of the subsequent sale of the Pledged Assets by FirstMerit to the JIRA Defendants.

The Court, therefore, concludes that Plaintiff has failed to state a claim for

violation of RICO against any of the JIRA Defendants.

Howard & Howard

The RICO predicate acts which Plaintiff alleges were perpetrated by Defendant

Howard & Howard can be divided into two categories:  (1) allegations concerning a

misrepresentation made to FirstMerit Bank, and (2) allegations concerning a

misrepresentation made to another lender Contemporary Health Care Fund I, L.P.

("CHC") in connection with an entirely unrelated loan transaction.

CHC provided Kevin Ruark financing to facilitate the growth of certain of his

22

businesses in 2009 and 2010. When Ruark subsequently defaulted on the CHC loan, he

requested that CHC forbear on collection and asked that the lender restructure the loan.

CHC agreed to do so. ABI alleges that Howard & Howard made fraudulent statements

in communicating with CHC during the CHC loan restructuring. The allegations of

fraud perpetrated against CHC consist of the following:

> 52. Attorney Booth, while employed by Howard & Howard, directly participated in Defendants' fraudulent enterprise by drafting correspondence to CHC that contained materially false representations regarding certain assets owned by Kevin Ruark. Booth authored this letter in order to secure a refinancing from CHC in furtherance of the Ruark Enterprise's goals of acquiring, partnering with, and looting the assets of viable HHCCs. Booth communicated this letter to CHC via email and/or regular mail.

***

> 199. Howard & Howard also made express representations in support of Ruark's quest to restructure and expand the CHC Loan. CHC which represented that Ruark, directly or indirectly, wholly owned the Michigan Entities (the "H&H Letter"). The H&H Letter expressly stated that Ruark wholly owned Superior, Superior wholly owned Life Care; and Life Care wholly owned FHHS. Howard & Howard communicated the July 3, 2012 letter to CHC via email and/or regular mail.

> 200. In reliance on Ruark's representations and documents, and specifically in reliance upon the H&H Letter, CHC agreed to forbear from exercising and enforcing its rights arising from existing defaults under the original CHC Loan and instead entered into the Second Amended and Restated Loan Agreement, dated July 3, 2012 (the "Second CHC Loan").

***

> 207. Moreover, Howard & Howard's Letter was knowingly false when drafted and submitted to CHC by Brandon Booth to fraudulently induce the closing of the Second CHC Loan.

***

209.   Ruark and Howard & Howard knowingly and intentionally misled CHC into believing that Ruark owned the Michigan Entities [the assets of which were provided as collateral] on the date of the CHC closing and was authorized to cause them to execute the Loan Documents and pledge their assets, under circumstances where they knew that Ruark did not own the Michigan Entities and did not have authority to bind them to the restructured CHC Loan.

210.   As a result of Ruark's fraudulent representations, CHC agreed to forbear from the exercise of its rights and remedies arising from the outstanding defaults under the Original Loans, and agreed to enter into the Loan Documents pursuant to which it re-issued existing debt and lent additional funds to the Borrowers.

[*See* First Amended Complaint, ¶¶ 191-210.]

The sum and substance of these allegations is that Howard & Howard defrauded CHC by an opinion letter dated July 3, 2012, stating that Kevin Ruark owned or had ownership interests in several entities, which ABI claims he did not actually have.  *See* First Amended Compl., ¶ 199.  However, even if this letter was, as ABI claims, fraudulent, ABI does not allege any injury to its business or property as a result of it. ABI only state that as a result of the letter, CHC "agreed to forbear from the exercise of its rights and remedies. . . ."  *Id.* at ¶ 200.  But ABI has not alleged any connection between ABI and CHC so even if by forbearing from the exercise of its rights and remedies somehow injured CHC, there is no injury to ABI alleged.  Nothing shows any involvement by ABI in the financing CHC extended to Kevin Ruark, nor are there any allegations of ABI's interests in the entities to which financing was extended.

24

If CHC believes it has been the victim of criminal conduct it certainly is capable of bringing suit itself,[14] and according to ABI, it already has a money judgment against Kevin Ruark for $4,200,000.  [First Amended Compl., ¶ 234,]  RICO does not allow ABI to seek relief under RICO when it has not been injured.  *See Jackson v. Sedgwick Claims Mgmt Serv's*, *supra,* 731 F.3d at 562. Because ABI fails to allege any harm to its business or property as a result of the alleged fraudulent opinion letter lent to CHC, ABI cannot state a claim against Howard & Howard for violation of RICO based on the CHC opinion letter.

Similarly, ABI cannot establish that its alleged injury -- i.e., the loss of the Pledge Assets at the foreclosure sale -- was caused by Howard & Howard's alleged fraudulent statement to FirstMerit Bank.  ABI's allegations of fraud relating to FirstMerit are as follows:

> 54.     Howard & Howard facilitated the purchase of the ABI Subsidiaries' assets and ABI's membership interests in the ABI Subsidiaries by representing to and assuring FirstMerit, through its counsel, that the Ruark Individuals were legally authorized to engage in the transaction without violating the Oakland County Circuit Court's order.  Booth's representations to FirstMerit's counsel were patently untrue at the time he made them.  In fact, the Ruark Individuals were ultimately held in contempt of court by entering into the transaction with First Merit because it violated

---

[14]  *See e.g., Hemi Group, LLC v. City of New York, NY*, 559 U.S. 1, 12 (2010) ("The State certainly is better situated than the [Plaintiff] City to seek recovery from [Defendant] Hemi.  And the State has an incentive to sue...."); *Anza v. Ideal Steel Supply Corp*., 547 U.S. 451, 460 (2006) ("[Plaintiff] Ideal acuses the [Defendant] Anzas of defrauding the State out of a substantial amount of money.  If the allegations are true, the State can be expected to pursue appropriate remedies.")

25

the Oakland County Circuit Court's "non-compete" order.

\*\*\*

56.    In September 2014, FirstMerit's counsel stated to ABI's counsel that it would never have entered into the purchase agreement with the Ruark Individuals if it had known that the transaction violated the Oakland County Circuit Court order.

57.    FirstMerit Senior Vice President Charles Flint confirmed that, had FirstMerit known that its sale of assets to the Ruark Individuals would have violated a court order, FirstMerit wold not have conducted the transaction with the Ruark Individuals.

\*\*\*

128.    FirstMerit engaged in negotiations with the Ruark Individuals and Howard & Howard in spite of the fact that FirstMerit knew that ABI had another financier lined up, Peachtree Equity Partners, to purchase its debt from FirstMerit received from the Ruark Individuals.  During these negotiations, Howard & Howard sent numerous email communications to FirstMerit's representatives, including drafts of purchase agreements.

\*\*\*

142.    If FirstMerit had not consummated a sale to the Ruark Individuals, it would have undertaken a transaction with Peachtree, which was the only other "suitor" at the time.  On information and belief, Peachtree intended to purchase FirstMerit's loan position and not the assets of ABI or the ABI Subsidiaries.  On information and belief, Peachtree also intended to provide additional financial support to ABI and the ABI Subsidiaries on a going forward basis.

\*\*\*

144.    Prior to November 7, 2013, to induce FirstMerit to enter the sale, the Ruark Individuals (most specifically, Jason Laing) and Howard & Howard (by its partner, attorney Brandon Booth) expressly represented to FirstMerit that the transaction would not violate any agreements or court orders which bound or applied to the purchasers.

26

145.    On Thursday, September 4, 2014 via telephone, counsel for FirstMerit Bank, Donald F. Baty ("Baty") told ABI's counsel that Howard & Howard attorney Brandon Booth expressly represented to him that the asset foreclosure sale would not violate any court orders.  Baty further stated that Booth's representation to Baty was the reason that a warranty and representation to that effect was expressly included in the sale agreements. Howard & Howard communicated its representations via telephone calls and emails.

146.    On September 4, 2014, Baty stated to ABI's counsel that FirstMerit relied upon the statements made by Brandon Booth/Howard & Howard and, had FirstMerit believed or known that entering into the asset foreclosure sale would violate court orders, FirstMerit would not have entered into the asset foreclosure sale with the Ruark Individual sand the JIRA Entities.

***

175.    If not for the concerted actions of Howard & Howard and the Ruark Individuals, Peachtree Equity Partners and/or certain other of ABI's financing sources would have purchased FirstMerit Bank's position and made additional investments and loans to ABI to finance and support operations.  Indeed, at the time of the November 7, 2013 foreclosure sale, Peachtree was the only other party seeking to consummate a deal with FirstMerit.

176.    Another particularly injurious result of the Ruark Individuals' and Howard & Howard's actions is that formerly aligned plaintiffs (ABI and its subsidiaries Subsidiary Companies) purportedly became adverse to one another it the Oakland County Litigation and had to find new counsel under applicable ethics rules.

177.    Though FirstMerit was the financial institution upon which this particular fraud was perpetrated, ABI was the actual and intended target and victim of the fraud and a direct victim of the Ruark Individuals' and Howard & Howard's fraudulent scheme to purchase ABI's assets.

[*See* First Amended Complaint].

To state a claim for violation of RICO, the plaintiff must show that a predicate

27

offense"not only was a 'but for' cause of [its] injury, but was the proximate cause as well. *Hemi Group, LLC v. City of New York, NY*, 559 U.S. 1, 9 (2010). Proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* (citation omitted). "A link that is too remote, purely contingent, or indirect, insufficient." *Id.* "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

"A predicate act does not proximately cause an injury if it merely furthers, facilitates, permits or conceals an injury to happen or could have happened independent of the act." *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216 (S.D.N.Y. 2002) (citation omitted).

To sustain its RICO claim in this case, ABI's asserted injury -- loss of its Assets -- must have come about "by reason of" the predicate mail or wire fraud allegedly perpetrated by Howard & Howard against FirstMerit. The fatal flaw in ABI's claim is that the conduct causing the supposed harm -- ABI's failure to comply with its loan obligations resulting in the sale of the Pledged Assets -- is distinct from the conduct giving rise to the alleged fraud -- Howard & Howard's alleged statement to FirstMerit that the asset foreclosure sale would not violate any court orders. In other words, without ABI's default on the FirstMerit Loan there could not have been a sale of the assets in the first place. Therefore, ABI cannot establish the Howard & Howard's alleged predicate

28

offense proximately caused its supposed injury.  Accordingly, ABI's RICO claim against Howard & Howard must be dismissed.

D.     ABI CANNOT STATE A CLAIM OF RICO CONSPIRACY

Section 1962(d) makes it unlawful for any person to conspire to violate RICO's criminal prohibitions.  18 U.S.C. § 1962(d).  To state a RICO conspiracy claim, the plaintiff must successfully allege all the elements of a RICO violation, as well as allege "the existence of an illicit agreement to violate the substantive RICO provision." *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983).  As set forth above, ABI has failed to make out a claim for a violation of RICO.  Therefore, it also has not claim under Section 1962(d) for RICO conspiracy.

For all of the foregoing reasons, Plaintiffs' claims for violation of RICO are DISMISSED, with prejudice.

E.     THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE LAW CLAIMS

A district court "may decline to exercise supplemental jurisdiction" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  District courts have "broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir.1996). Generally, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Id*. at

29

1254-55. In fact, the Sixth Circuit has directed that "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment." *Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001). This is particularly true where, as here, the remaining state law claim entirely dominates the case at this point in the proceedings. *See* 29 U.S.C. § 1367(c)(2), (3). This rule accords with principles of federalism: "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130. These comity interests further persuade the Court that it should not exercise jurisdiction over the state law claims in this case where ther remains pending (albeit presently stayed) a state court action, in which some or all of these claims may have been, or could have been, raised.

Guided by the foregoing principles, the Court concludes that it should decline to exercise supplemental jurisdiction over Plaintiffs' remaining conversion/aiding and abetting and declaratory judgment claims in Counts II, IV and V.[15] Therefore,

<u>CONCLUSION</u>

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendants' Motions to Dismiss **[Dkt. Nos. 35**

---

[15] As noted above, Plaintiffs have withdrawn their constructive trust claim in Count III, and that claim, accordingly, is DISMISSED, without prejudice.

**& 36]** are GRANTED, as follows:

(1)  The JIRA Defendants' Fed. R. Civ. P. 12(b)(1) Motion to Dismiss the claims

of the claims of the New Plaintiffs JIRA Holdings, KJJ Holdings, Health Care Partners,

SWHHC Holdings, SWHHC Management, SWHHC-Central Texas, SWHHC-Harris,

SWHHC-East Texas, and SWHHC-Dallas is GRANTED, and the claims asserted on

behalf of these plaintiffs are DISMISSED for lack of subject matter jurisdiction.

(2)  The JIRA Defendants' and Howard & Howard's Fed. R. Civ. P. 12(b)(6)

Motions to Dismiss are GRANTED with respect to the RICO claims in Count I of

Plaintiffs' First Amended Complaint, and those claims, accordingly, are DISMISSED,

WITH PREJUDICE.

The Court having concluded that it should decline to exercise supplemental

jurisdiction over Plaintiffs' remaining state law claims,

IT IS FURTHER ORDERED that Plaintiffs' remaining state law claims are

DISMISSED, without prejudice.

Let Judgment be entered accordingly.

s/Gerald E. Rosen
United States District Judge

Dated:  September 30, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on September 30, 2016, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135